**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **GARY PATRICK THOMAS** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. WGC-10-1528** |
| | ) | |
| **MICHAEL ASTRUE** | ) | |
| **Commissioner of Social Security** | ) | |
| | ) | |
| **Defendant.** | ) | |

<u>**MEMORANDUM OPINION**</u>

Plaintiff Gary Patrick Thomas ("Mr. Thomas" or "Plaintiff") brought this action pursuant to 42 U.S.C. § 405(g) for review of a final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying his claims for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI of the Act, 42 U.S.C. §§ 401-433, 1381-1383f.  The parties consented to a referral to a United States Magistrate Judge for all proceedings and final disposition.  *See* Document Nos. 4-6.[1]  Pending and ready for resolution are Plaintiff's Motion for Summary Judgment (Document No. 10) and Defendant's Motion for Summary Judgment (Document No. 11).  No hearing is deemed necessary.  *See* Local Rule 105.6 (D. Md. 2010).  For the reasons set forth below, Defendant's Motion for Summary Judgment will be granted and Plaintiff's Motion for Summary Judgment will be denied.

---

[1]  The case was subsequently reassigned to the undersigned.  *See* Document Nos. 12-13.

1. **Background**.

On July 25, 2006 Mr. Thomas protectively filed applications for DIB[2] and SSI alleging a disability onset date of February 24, 2005 due to cervical[3] radiculitis[4] and cervical disc disease. *See* R. at 51-52, 127-38, 153. Mr. Thomas's applications were denied initially on October 12, 2006. R. at 62-66. On December 11, 2006 Mr. Thomas requested reconsideration, R. at 67-70, and on April 6, 2007 the applications were denied again. R. at 73-74. The Social Security Administration received Mr. Thomas's request for a hearing before an Administrative Law Judge ("ALJ"). R. at 75-77. After two delays, R. at 41-45, 46-50, on October 22, 2008 the ALJ convened a hearing. R. at 20-40. Mr. Thomas was represented by counsel. At this hearing Mr. Thomas's attorney requested a closed period of disability from February 24, 2005 to June 23, 2008. The ending date of June 23, 2008 is the date when a Functional Capacity Evaluation found Mr. Thomas is capable of performing medium work. R. at 25, 363-71. The ALJ granted the request and noted the DIB and SSI claims are for a closed period from February 24, 2005 to June 23, 2008. R. at 26. During the hearing the ALJ obtained testimony from Mr. Thomas and a vocational expert ("VE"). In the November 3, 2008 decision the ALJ found Mr. Thomas is not disabled within the meaning of the Act. R. at 19. Mr. Thomas requested a review of the hearing decision. R. at 5. On April 30, 2010 the Appeals Council denied Mr. Thomas's request for review, R. at 1-3, thus making the ALJ's determination the Commissioner's final decision.

---

[2] Mr. Thomas has acquired sufficient quarters of coverage to remain insured through December 31, 2010. *See* R. at 10, 12, 139, 145, 149.

[3] Cervical means "pertaining to the neck, or to the neck of any organ or structure." *Dorland's Illustrated Medical Dictionary* 307 (27th ed. 1988).

[4] Radiculitis means "inflammation of the root of a spinal nerve, especially of that portion of the root which lies between the spinal cord and the intervertebral canal." *Id.* at 1405.

2. **ALJ'S Decision**.

The ALJ evaluated Mr. Thomas's claims for DIB and SSI using the sequential evaluation process set forth in 20 C.F.R. §§ 404.1520, 416.920. Mr. Thomas bears the burden of demonstrating his disability as to the first four steps. At step five the burden shifts to the Commissioner. If Mr. Thomas's claims fail at any step of the process, the ALJ does not advance to the subsequent steps. *Pass v. Chater*, 65 F.3d 1200, 1203 (4th Cir. 1995).

At step one the ALJ found Mr. Thomas has not engaged in substantial gainful activity during the closed period of disability (February 24, 2005 through June 23, 2008). R. at 12. The ALJ concluded at step two that Mr. Thomas has the following severe impairments: "right cervical radiculitis; moderate degenerative joint disease of the right acromioclavicular[5] joint; mild carpal tunnel syndrome; depression; a mood disorder; and polysubstance dependence, in remission." *Id.* The ALJ noted medical records from treating and examining sources, as well as laboratory and clinical findings, support and verify these impairments.

At step three the ALJ determined Mr. Thomas does not have an impairment or combination of impairments that meets or medically equals the criteria of any of the listed impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1. The ALJ specifically considered Listing 1.02 (*Major dysfunction of a joint(s) (due to any cause)*). "The claimant's shoulder impairment was not evidenced by appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis.[6] Additionally, his shoulder impairment and

---

[5] Acromioclavicular means "pertaining to the acromion ["the lateral extension of the spine of the scapula, projecting over the shoulder joint and forming the highest point of the shoulder"] and clavicle ["the bone articulating with the sternum and scapula"], especially to the articulation between the acromion and clavicle." *Id.* at 21, 343.

[6] Ankylosis means "immobility and consolidation of a joint due to disease, injury, or surgical procedure." *Id.* at 91.

mild carpal tunnel syndrome did not result in an inability to effectively perform fine and gross movements in each upper extremity." R. at 13.

In accordance with 20 C.F.R. §§ 404.1520a, 416.920a, the ALJ followed a special technique to evaluate the severity of Mr. Thomas's depression, a mood disorder and polysubstance dependence (in remission). The ALJ specifically considered Listings 12.04 (*Affective Disorders*), 12.07 (*Somatoform[7] Disorders*) and 12.09 (*Substance Addiction Disorders*).

"We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently, appropriately, effectively, and on a sustained basis." 20 C.F.R. §§ 404.1520a(c)(2), 416.920a(c)(2) (2008). The ALJ rated the degree of Mr. Thomas's functional limitation in the four broad functional areas. *See id.* §§ 404.1520a(c)(4), 416.920a(c)(4). The ALJ reviewed the medical evidence of record including the consultative mental evaluation by Dr. Mikhael Taller as well as the Psychiatric Review Technique form and the Mental Residual Functional Capacity Assessment form completed by Diana Walcutt, Ph.D., a State agency psychological consultant. Adopting the clinical findings of Dr. Walcutt, which the ALJ found completely consistent with the evidence of record, the ALJ determined Mr. Thomas has *mild* restriction in activities of daily living, *mild* difficulties in maintaining social functioning, *moderate* difficulties in maintaining concentration, persistence, or pace, and *no* evidence of any episodes of decompensation. R. at 13.

"Because the claimant's mental impairments do not cause at least two 'marked' limitations or one 'marked' limitation and 'repeated' episodes of decompensation, each of extended duration, the 'paragraph B' criteria are not satisfied. The claimant's mental

---

[7] Somatoform means "denoting psychogenic symptoms resembling those of physical disease." *Id.* at 1547.

impairments do not satisfy the 'C' criteria of the mental listings." R. at 14. Having rated the degree of functional limitations, the ALJ continued with the sequential evaluation process.

Next the ALJ determined Mr. Thomas's residual functional capacity ("RFC"). The ALJ found Mr. Thomas could have performed a range of light work but with specific restrictions during the closed period of disability. "He was limited to standing no more than 30 to 45 minutes at one time. He could not climb ladders, ropes, or scaffolds. He could perform postural activities such as stooping on an occasional basis. He was precluded from lifting above shoulder level, from constant reaching with the upper extremities, and from constant handling and/or fingering with his right upper extremity. He had to avoid quick or repetitive motions with the neck. The claimant also had moderate difficulties in concentration, persistence, or pace, and was therefore limited to unskilled tasks during that time." *Id.* (footnotes omitted).

At step four the ALJ found Mr. Thomas is unable to perform any past relevant work during the requested closed period of disability from February 24, 2005 to June 23, 2008. Mr. Thomas lacked the RFC to work as a bus driver (medium/semi-skilled), in building maintenance (heavy as performed/unskilled), in road maintenance (heavy/unskilled) and a groundskeeper (medium/unskilled). R. at 17. Finally, at step five, the ALJ considered Mr. Thomas's age (39 on the alleged date of onset; 41 at the hearing), education (high school graduate and able to communicate in English), past work experience (transferability of job skills is not material) and his RFC (range of light work with restrictions). The ALJ found the Social Security Administration met its burden of proving that Mr. Thomas was capable of performing various other jobs[8] that exist in significant numbers in the national economy during the closed period of disability,

---

[8] A counter clerk, a non-postal mail clerk and an office helper.

relying on the testimony of the VE.  R. at 18-19, 38.  Accordingly, the ALJ concluded that Mr. Thomas is not disabled within the meaning of the Act.  R. at 19.

3. **Standard of Review**.

The role of this Court on review is to determine whether substantial evidence supports the Commissioner's decision and whether the Commissioner applied the correct legal standards.  42 U.S.C. § 405(g); *Pass v. Chater*, 65 F.3d at 1202; *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).  It is more than a scintilla, but less than a preponderance, of the evidence presented, *Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984) (citations omitted), and it must be sufficient to justify a refusal to direct a verdict if the case were before a jury.  *Hays*, 907 F.2d at 1456.  This Court cannot try the case *de novo* or resolve evidentiary conflicts, but rather must affirm a decision supported by substantial evidence.  *Id*.

4. **Discussion.**

Plaintiff contends the ALJ committed multiple errors and therefore the ALJ's findings are not supported by substantial evidence.  The Court addresses these allegations below.

     *A.    Failure to Compare Medical Evidence to Listings of Impairments*

Plaintiff argues the ALJ failed to sufficiently compare Mr. Thomas's medical evidence of record to the listings of impairments resulting in the ALJ misapplying the law.  Plaintiff raises this argument with regard to five specific conditions.

1.    Listing 1.04

Plaintiff claims "the ALJ found that the evidence demonstrated that Mr. Thomas did not have objective findings and functional limitations sufficient to be considered 'disabled' under Section 1.04." Pl.'s Mem. Supp. Mot. for Summ. J. ("Pl.'s Mem.") at 26.  The Court notes the ALJ's decision does not mention Listing 1.04.

Listing 1.04 concerns *Disorders of the spine*.  Plaintiff contends the medical record is replete with references to Mr. Thomas's neck pain, cervical spine and restricted or limited cervical range of motion.  The Commissioner acknowledges that while the ALJ identified right cervical radiculitis as one of Mr. Thomas's severe impairments at step two, the ALJ failed to discuss Listing 1.04 at step three.  "The ALJ was not required to address this Listing because there is not ample evidence in the record that Mr. Thomas's cervical radiculitis met or equaled this Listing."  Mem. Law Supp. Def.'s Mot. Summ. J. ("Def.'s Mem.") at 25.

A review of the record reveals Mr. Thomas had an extensive relationship with his orthopedic doctor, James Weiss.  Mr. Thomas's first visit, a consultation, with Dr. Weiss occurred on March 4, 2005.  During this consultation, about a week after Mr. Thomas's accident, Dr. Weiss noted "[c]ervical range of motion is restricted to right rotation to about 60 degrees."  R. at 289.  During the April 20, 2005 visit Dr. Weiss recorded "[c]ervical range of motion is decreased."  R. at 285.  The following day Dr. Weiss examined Mr. Thomas and noted "[c]ervical range of motion is still restricted."  R. at 284.  Dr. Weiss had requested X-rays of Mr. Thomas's cervical spine.  "Cervical spine films are normal for age."  *Id.*  The next time there is a reference to Mr. Thomas's cervical spine is on December 28, 2005 when Dr. Weiss recorded "[r]educed cervical range of motion is present as well."  R. at 275.

Approximately seven weeks after the surgery on Mr. Thomas's right rotator cuff, on March 1, 2006, Dr. Weiss noted during the physical examination that Mr. Thomas "has no Tinel's[9] in his cervical spine, but definitely has restricted cervical range of motion."  R. at 271.  X-rays taken of the cervical spine showed "complete loss of cervical lordosis."[10]  *Id.*  Dr. Weiss postulated "whether he either has some RSD[11] going on and/or cervical radiculitis.  I have ordered an MRI to differentiate between the two that is of his cervical spine."  *Id.*  On March 10, 2006 under "Assessment & Plan," Dr. Weiss wrote in pertinent part, "The spectrum of RSD versus thoracic outlet syndrome[12] versus cervical radiculitis, all come into place. . . . He needs a cervical MRI and start active/active–assist range of motion and physical therapy."  R. at 291.  On March 20, 2006 Dr. Weiss still found as restricted Mr. Thomas's cervical range of motion.  R. at 270.  Dr. Weiss noted he awaited the cervical MRI results.  By the next appointment, April 5, 2006, the cervical MRI results had been received.  The MRI showed "right-sided foraminal stenosis[13] at C3-C4, C4-C5 and minimally at C5-C6."  R. at 269.  Based on the MRI Dr. Weiss assessed "[m]ost likely radicular component to his symptoms."  *Id.*  Dr. Weiss referred Mr.

---

[9]  Tinel's sign means "a tingling sensation in the distal end of a limb when percussion is made over the site of a divided nerve.  It indicates a partial lesion or the beginning regeneration of the nerve."  *Id.* at 1526.

[10]  Lordosis means "the anterior concavity in the curvature of the lumbar and cervical spine as viewed from the side.  The term is used to refer to abnormally increased curvature (hollow back, saddle back, swayback) and to the normal curvature (normal lordosis)."  *Id.* at 954.

[11]  Reflex sympathetic dystrophy or RSD is "[a] condition characterized by diffuse pain, swelling and limitation of movement that follows an injury such as a fracture in an arm or leg[.]  The symptoms are way out of proportion to the injury and may linger long after the injury has healed."  *MedicineNet.com*, http://medterms.com/script/main/art.asp?articlekey=12898 (last visited April 5, 2011).

[12] Thoracic outlet syndrome "is a condition whereby symptoms are produced from compression of nerves or blood vessels, or both, because of an inadequate passageway through an area (thoracic outlet) between the base of the neck and the armpit."  *MedicineNet.com*,  http://www.medicinenet.com/thoracic_outlet_syndrome/article.htm (last visited April 5, 2011).

[13]  Stenosis means "a narrowing or stricture of a duct or canal."  *Dorland's Illustrated Medical Dictionary* 1579.

Thomas for root blocks on the right side of C3-C4 and C4-C5.  He noted root blocks at C5-C6 may be necessary.  *Id.*

On April 18, 2006 Mr. Thomas saw Dr. James Uy of the Interventional Pain Management Center of Metro Washington.  Mr. Thomas reported "[t]he neck pain is mostly dull and achy, mild to moderate in intensity."  R. at 237.  During the physical examination, with regard to the cervical spine, Dr. Uy reported "[m]otion restriction in right lateral rotation and tilting to about 50% of normal; pain on motion in all directions; mild to moderate tenderness of the right cervical paraspinal muscle; and moderate tenderness with spasm of the right trapezius muscles."  R. at 238.  Based on the physical examination and Mr. Thomas's medical history, Dr. Uy opined Mr. Thomas suffers from (1) right cervical radiculitis, (2) cervical disc disease and (3) chronic right shoulder pain.  Dr. Uy proceeded with the recommended root blocks on the right side of C3-C4 and C4-C5.

Mr. Thomas had a follow-up appointment with Dr. Weiss on April 26, 2006.  Mr. Thomas reported receiving the cervical root block the prior day.  He noticed no difference in his level of pain.  Dr. Weiss assessed that Mr. Thomas is likely "getting cervical radiculitis."  R. at 268.  He would see Mr. Thomas in two to three weeks allowing time for the root blocks to provide relief.

At his second appointment with Dr. Uy on May 2, 2006, Mr. Thomas reported minimal relief from root blocks done two weeks ago.  Dr. Uy's physical examination revealed no significant changes from the previous examination.  He maintained the same assessment of Mr. Thomas's condition, namely (1) cervical radiculitis, (2) cervical disc disease and (3) chronic right shoulder pain.  R. at 239.  Mr. Thomas saw Dr. Weiss on June 5, 2006.  Under "History" Dr. Weiss reported that Mr. Thomas "has had two cervical root blocks and is going to have the

third.  This has helped him some."  R. at 290.  Under "Assessment & Plan," Dr. Weiss wrote, "Continue physical therapy and additional root block.  If he does not get adequate relief with the root block, he would be a candidate for a more aggressive treatment."  *Id.*  Mr. Thomas saw Dr. Uy for a third time on June 20, 2006.  Dr. Uy recorded under brief history that "[a]fter the second transforaminal blocks with no significant relief, we decided to do interlaminar cervical epidural block with no relief.  [Mr. Thomas] still rates his . . . neck and arm pain at 6-8/10."  R. at 240.  Dr. Uy physically examined Mr. Thomas and found "moderate tenderness of the right cervical spine and right shoulder.  Cervical spine mobility is with right sided pain and with restrictions of movements on extension and lateral rotation, extremes of flexion and side tilting."  *Id.*  Dr. Uy diagnosed (1) right cervical radiculitis and (2) chronic right shoulder pain.  Dr. Uy referred Mr. Thomas to Dr. Weiss "for re-evaluation and further management with possibility of surgical intervention."  *Id.*

Mr. Thomas saw Dr. Weiss on July 6, 2006.  During the physical examination Dr. Weiss noted "cervical range of motion is decreased to right and left rotation."  R. at 267.  Another X-ray of Mr. Thomas's cervical spine was unchanged from a previous X-ray.  Dr. Weiss made the following assessment:  "He has three levels of cervical pathology.  Two of them C3-C4 and C4-C5 are more significant tha[n] C5-C6.  Likely he will be a candidate for his cervical fusion."  *Id.*  On July 11, 2006 Mr. Thomas had another appointment with Dr. Uy.  On physical examination Dr. Uy determined "[t]here is still moderate tenderness of the right cervical region and right shoulder area.  There is pain on motion of the cervical spine with restriction of movements."  R. at 241.  Dr. Uy again diagnosed (1) right cervical radiculitis and (2) chronic right shoulder pain.

Dr. Uy discharged Mr. Thomas from his practice and referred Mr. Thomas to Dr. Weiss for a follow-up appointment.

Mr. Thomas saw Dr. Weiss on August 11, 2006. Dr. Weiss found as restricted Mr. Thomas's cervical range of motion. Under "Assessment & Plan" Dr. Weiss wrote,

> He needs manipulation of his shoulder to improve his range of motion. I still believe that there is some cervical component to this. I have read the IME by Dr. Smith, who feels that there is no indication for cervical spine surgery; however, the MRI is consistent with foraminal stenosis at two levels in the cervical spine and he has symptoms that are consistent with this, although, it is unlikely he would get a 100% relief of his symptoms. I believe there would be some likely component of improvement to the radicular symptoms with surgical intervention.

R. at 266.

During the August 31, 2006 visit Dr. Weiss again noted the cervical range of motion is restricted. R. at 265. Dr. Weiss made identical findings upon physical examination on September 21, 2006. Dr. Weiss noted under "Assessment & Plan" that "[Mr. Thomas] is still having neck-related symptoms, and in my opinion there is some possibility that he would benefit from more aggressive treatment for his cervical spine." R. at 264. On October 11, 2006 Dr. Weiss found the cervical range of motion is decreased. R. at 263. Upon physical examination on November 13, 2006 Dr. Weiss noted Mr. Thomas's cervical range of motion is decreased in all planes. Additionally Dr. Weiss found Mr. Thomas "does have Tinel in his right trapezial area." R. at 262. Dr. Weiss found a decreased range of motion as well as cervical tenderness upon examination on December 4, 2006. Dr. Weiss opined Mr. Thomas still has cervical radiculitis. R. at 261.

When Dr. Weiss examined Mr. Thomas on January 15, 2007, he found Mr. Thomas's cervical range of motion was still restricted. Dr. Weiss had referred Mr. Thomas to Dr. Bruce Ammerman for a consultation. Under "Assessment & Plan" Dr. Weiss recorded, "He did see Dr. Bruce Ammerman, who felt he did not need cervical spine surgery. I have reviewed the report and respectfully disagree with his findings, and my recommendation for his is unchanged." R. at 259. On February 21, 2007 Dr. Weiss found a decreased cervical range of motion upon physical examination. R. at 246, 354. On March 19, 2007 Dr. Weiss did not conduct a physical examination. He opined as follows: "[Mr. Thomas] seems to be having cervical associated pain and likely since all other treatments have failed, he would be a candidate for cervical spine surgery, despite opinions to the contrary." R. at 353.

During the physical examination on April 16, 2007 Dr. Weiss found "decreased and fairly poor range of motion of the cervical spine. . . . He has Tinel in his right trapezial area." R. at 351. On May 23, 2007 the physical examination continued to reveal a decreased range of motion of the cervical spine. Dr. Weiss opined with emphasis, "<u>He is still in need for cervical spine surgery and right shoulder manipulation</u>." R. at 349. Again, on June 6, 2007, the physical examination revealed a decrease in the cervical range of motion. R. at 348. On December 19, 2007 Dr. Weiss opined "[Mr. Thomas] may have a cervical root traction or brachial[14] plexus[15] component to his injury, but certainly there is no indication for cervical spine surgery, so this should not be pursued. . . ." R. at 347. For the first time Dr. Weiss opined Mr. Thomas's cervical condition does not warrant surgery.

---

[14] Brachial means "pertaining to the arm." *Id.* at 229.

[15] Plexus means "a network or tangle, a general term for a network of lymphatic vessels, nerves or veins." *Id.* at 1310.

By January 17, 2008 Dr. Weiss had clearly changed his mind about surgery to remedy Mr. Thomas's cervical spine discomfort. "I have reviewed the report by Dr. Powers, and I agree with this that he does not need any cervical spine surgery." R. at 345. During the March 17, 2008 office visit Dr. Weiss wrote, under "Assessment & Plan" that "[Mr. Thomas's] upper extremity pseduoradicular symptoms likely are referred from his shoulder and not likely readily treatable to resolvable since his cervical spine pathology is limited and does not require direct intervention." R. at 341. On June 18, 2008, the last visit during the closed period of disability ending on June 23, 2008, Dr. Weiss, upon physical examination, found "cervical range of motion is near full to right and left rotation." R. at 360.

The Commissioner argues that, based on the medical evidence of record, the ALJ was not required to discuss Listing 1.04A since there was a lack of evidence of a nerve root compression. In the alternative, if the Court finds the ALJ should have discussed Listing 1.04A, the Commissioner argues the error was harmless. Further the Commissioner asserts the ALJ would not have reached a different conclusion *even if* the ALJ had examined Listing 1.04A.

Listing 1.04A states

> *Disorders of the spine* (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:
>
> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine)[.]

The Court finds no error by the ALJ for failing to discuss Listing 1.04A. As outlined in the chronology of the medical records above, an MRI revealed stenonsis. Dr. Weiss referred Mr. Thomas to a pain management specialist. When that referral produced no appreciable pain relief, Dr. Weiss *originally* determined surgery was Mr. Thomas's next best option even though it would not completely resolve Mr. Thomas's complaints. Mr. Thomas had consultations with Dr. Smith and Dr. Ammerman, both who opined Mr. Thomas was not a candidate for surgery. Dr. Weiss disagreed. Only later did Dr. Weiss agree with Dr. Powers that cervical spine surgery was not necessary.

In other words, Dr. Weiss's diagnosis of Mr. Thomas's complaints changed over time. Dr. Weiss ultimately determined that cervical spine surgery was unnecessary. He characterized Mr. Thomas's upper extremity complaints as ***pseudoradicular symptoms*** and further determined the source was likely from his shoulder and not the cervical spine. *See* R. at 341. Moreover, during Mr. Thomas's last visit with Dr. Weiss, shortly before the end of the closed period of disability, on physical examination Dr. Weiss found "cervical range of motion is near full to right and left rotation." R. at 360. Because Dr. Weiss's ultimate opinion evolved as he continued to treat Mr. Thomas during the closed period of disability and because with Dr. Weiss's ultimate opinion there was no evidence of findings consistent with Listing 1.04A or its equivalent, the omission of any discussion of Listing 1.04A at step three was not an error.

2.    Listing 1.02

Listing 1.02 covers *Major dysfunction of a joint(s) (due to any cause)*. The pertinent portion of this listing, in light of Mr. Thomas's impairments, states:

> Characterized by gross anatomical deformity (e.g. subluxation, contracture, bony or fibrous ankylosis, instability) and chronic

joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s). With:

\*                              \*                              \*

B.  Involvement of one major peripheral joint in each upper extremity (*i.e.*, shoulder, elbow, or wrist-hand), resulting in inability to perform fine and gross movements effectively, as defined in 1.00B2c.

The record clearly established Mr. Thomas suffered an injury to his right shoulder.  He complained of symptoms (pain, tenderness, numbness or tingling) to his right hand, right wrist, right elbow and neck.  Contrarily, the only reference to any issue with his left upper extremity is a notation about a prior left carpal tunnel surgery on the left hand during a follow-up visit on May 23, 2007.  R. at 349.  That same doctor's report noted that an EMG/nerve conduction study on May 21, 2007 showed "some mild bilateral carpal tunnel syndrome[.]"  *Id.*  Besides these two notations during this one office visit, the record otherwise reflects no impairments with Mr. Thomas's left shoulder, arm, hand, wrist or elbow.  At a consultation on May 18, 2006, Dr. Uy physically examined Mr. Thomas and found "[t]he muscle strength of the left upper and both lower extremities is 5/5 while the right upper extremity is 4/5."  R. at 238.  A neurologic consultative examination by Dr. James Yan was conducted on March 22, 2007.  Dr. Yan physically examined Mr. Thomas.  Dr. Yan noted some restrictions with Mr. Thomas's right upper extremity.  "His other three extremities are 5/5 throughout and good full range of motion."  R. at 317.  Contrary to Listing 1.02, Mr. Thomas's major joint dysfunction, during the closed period of disability, did not involve **each upper extremity**.  Only the right upper

extremity was affected.  The ALJ's determination that Mr. Thomas did not meet or medically equal Listing 1.02 is supported by substantial evidence.

3.      Listing 12.09

Listing 12.09 concerns *Substance Addiction Disorders*.  Dr. Taller, who diagnosed this mental condition, specifically determined polysubstance abuse **in remission**.  R. at 310 (emphasis added).  During the March 21, 2007 consultative mental examination Mr. Thomas disclosed that he stopped using drugs and alcohol three years ago.  As the Commissioner notes, three years before March 2007 would have been March 2004, approximately one year *before* the alleged onset date of Mr. Thomas's disability on February 24, 2005.  The ALJ's determination that Mr. Thomas did not meet or medically equal Listing 12.09 is supported by substantial evidence.

4.      Listing 12.07

Listing 12.07 covers *Somatoform Disorders*, meaning "[p]hysical symptoms for which there are no demonstrable organic findings or known physiological mechanism."  20 C.F.R. Pt. 404, Subpt P, App. 1, § 12.07 (2008).  Mr. Thomas must meet the requirements of paragraph A (a listing of certain physical symptoms) and paragraph B (the degree of limitation in four functional areas).  There is no evidence in the record medically documenting the physical symptoms outlined in Listing 12.07, paragraph A and Mr. Thomas, who bears the burden at step three, fails to identify any such evidence in the record.  Moreover Mr. Thomas has not identified any evidence meeting Listing 12.07, paragraph B, whereby Mr. Thomas is required to meet at least two of the following four: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties  in maintaining concentration,

persistence, or pace; or repeated episodes of decompensation, each of extended duration.  The ALJ's determination that Mr. Thomas did not meet or medically equal Listing 12.07 is supported by substantial evidence.

    5.    <u>Listing 12.04</u>

Listing 12.04 addresses *Affective Disorders*.  The Social Security Administration describes this impairment as follows: "Characterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome.  Mood refers to a prolonged emotion that colors the whole psychic life; it generally involves either depression or elation."  20 C.F.R. Pt. 404, Subpt P, App. 1, § 12.04.  To meet this listing Mr. Thomas must satisfy paragraphs A and B or paragraph C.  Dr. Taller diagnosed Mr. Thomas with Mood Disorder, NOS (Not Otherwise Specified).  Dr. Taller ruled out Mr. Thomas's mood disorder was due to a medical condition or was substance induced.  R. at 310.  The evidence of record fails to show conditions meeting the criteria of paragraph A and Mr. Thomas, who bears the burden at step three, does not make such a demonstration.  As noted in the discussion of Listing 12.07, Mr. Thomas does not meet the paragraph B criteria.  With regard to the paragraph C criteria, no medically documented history is found in the record and Mr. Thomas fails to demonstrate how he satisfies paragraph C.  The ALJ's determination that Mr. Thomas did not meet or medically equal Listing 12.04 is supported by substantial evidence.

    6.    <u>Combination of Impairments</u>

Plaintiff contends, even if the Court finds none of the individual impairments meet or equal a listing, Mr. Thomas should be found disabled "on the basis of the effect of the combination of the impairments to his lumbar spine, depression and anxiety disorders."  Pl.'s

Mem. at 33. Plaintiff correctly notes the ALJ has a duty to consider the combined effect of multiple impairments. "[W]e will consider the combined effect of all of your impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity. If we do find a medically severe combination of impairments, the combined impact of the impairments will be considered throughout the disability determination process." 20 C.F.R. §§ 404.1523, 416.923 (2008).

At step three the ALJ did not find Mr. Thomas's combination of impairments—right cervical radiculitis; moderate degenerative joint disease of the right acromioclavicular joint; mild carpal tunnel syndrome; depression; a mood disorder; and polysubstance dependence, in remission—met or equaled one of the listed impairments. Plaintiff, who bears the burden at step three, has not identified *any* listed impairment that Mr. Thomas's combination of impairments purportedly meets or equals.

In accordance with §§ 404.1523 and 416.923, the ALJ considered the combined impact of the impairments throughout the remainder of the disability determination process. This consideration is readily apparent with Mr. Thomas's RFC.

> A review of the RFC determination confirms that the ALJ took into account the combined effect of all of Mr. Thomas's impairments and that it was supported by substantial evidence. The RFC contains limitations that account for each of Mr. Thomas's severe impairments and the impairments in combination. The RFC addresses the effect of Mr. Thomas's shoulder impairment (an overall limitation to light work with additional restrictions that Mr. Thomas "could not climb ladders, ropes, or scaffolds" and was "precluded from lifting above shoulder level [and] from constant reaching with the upper extremities"), cervical radiculitis and associated neck limitations ("avoid quick or repetitive motions with the neck"), carpal tunnel syndrome (precluded from "constant reaching with upper extremities" and "constant

handling and/or fingering with his right upper extremity") and
mental impairments ("limited to unskilled tasks") (Tr. 14).

Def.'s Mem. at 33.

The ALJ's determination on this matter is supported by substantial evidence.

B.    *Weight Assigned to Medical Opinions*

Plaintiff contends the ALJ erred is not assigning *greater weight* to Mr. Thomas's treating
and examining physicians.  Moreover Plaintiff asserts the ALJ not only assigned greater weight
to the opinions of Dr. Diana Walcutt and Dr. William Hakkarinen, non-examining physicians, but
that the ALJ accorded *controlling weight* to the opinions of these non-examining physicians.

First, in reviewing the ALJ's decision, the Court finds the ALJ **did not accord controlling
weight** to the opinions of Dr. Walcutt and Dr. Hakkarinen.  Dr. Walcutt, a state agency
psychologist, completed a Mental Residual Functional Capacity Assessment form (R. at 322-25)
and a Psychiatric Review Technique form (R. at 326-39).  Her assessments were based almost
exclusively on the March 26, 2007 Psychiatric Report of Dr. Taller.  The ALJ specifically found
the Psychiatric Review Technique findings, which the ALJ adopted as consistent with the
evidence of record, "is also consistent with Dr. Taller's consultative mental evaluation. . . ."  R.
at 14.  Plaintiff does not indicate how Dr. Walcutt's findings are inconsistent with Dr. Taller's
consultative mental evaluation.  For instance, based on his direct observation and evaluation of
Mr. Thomas's mental status, Dr. Taller reported Mr. Thomas "states he has unstable
concentration, memory, poor sleep, average appetite, average motivation and interest level."
R. at 309-10.  In evaluating Mr. Thomas's degree of limitation in the four broad functional areas,
Dr. Walcutt opined Mr. Thomas has *moderate* difficulties in maintaining concentration,
persistence, or pace.  R. at 336.

Dr. Hakkarinen, the other non-examining state agency doctor, completed the Physical Residual Functional Capacity Assessment form (R. at 295-302). Based on a review of the medical records Dr. Hakkarinen opined Mr. Thomas could lift 10 pounds frequently, occasionally lift 20 pounds, stand or walk for about 6 hours in an 8-hour workday, sit for about 6 hours in an 8-hour workday and has unlimited ability to push or pull. R. at 296. Dr. Hakkarinen determined Mr. Thomas has postural limitations. Mr. Thomas could never climb ladders/ropes/scaffolds. Mr. Thomas could occasionally climb ramps/stairs, stoop, kneel, crouch, and crawl. Additionally, Mr. Thomas could frequently balance. R. at 297. With regard to Manipulative Limitations Dr. Hakkarinen determined Mr. Thomas is limited with handling (gross manipulation) but unlimited as to reaching all directions (including overhead), fingering (fine manipulation) and feeling (skin receptors). R. at 298.

If the ALJ had accorded *greater weight* to Dr. Hakkarinen's opinion as alleged by Plaintiff, then it is unclear why the ALJ (1) rejected Dr. Hakkarinen's opinion that Mr. Thomas could stand or walk for about 6 hours in an 8-hour workday and instead, in determining Mr. Thomas's RFC, limited Mr. Thomas "to standing no more than 30 to 45 minutes at one time", R. at 14, and (2) rejected Dr. Hakkarinen's opinion that Mr. Thomas has an unlimited ability to reach including overhead in all directions and an unlimited ability in fingering (fine manipulation) and instead determined Mr. Thomas's RFC "precluded [him] from lifting above shoulder level, from constant reaching with upper extremities, and from constant handling

and/or fingering with his right upper extremity", *id.* It is evident that Dr. Hakkarinen's opinion was not given *controlling weight*.[16]

Regarding the medical opinions of Mr. Thomas's treating sources, Dr. Yan conducted a consultative physical examination on March 22, 2007. The ALJ gave "some evidentiary weight" to Dr. Yan's opinion which the ALJ found "generally consistent with the claimant's right upper extremity impairment during the closed period." R. at 16. In his Neurology Report Dr. Yan wrote in pertinent part, "Basically [Mr. Thomas] has lost use at this moment. He cannot lift heavy things and he cannot do fine motor manipulation with his right arm and right hand." R. at 317. In his decision the ALJ noted "the evidence in its entirety does not suggest that the claimant was entirely incapable of performing fine motor manipulation. . . the evidence also shows that his condition continued to improve." R. at 16. Plaintiff does not point to any evidence contradicting the ALJ's finding.

With regard to Dr. Weiss, Mr. Thomas's primary doctor, the ALJ accorded limited evidentiary weight to Dr. Weiss's opinions regarding Mr. Thomas's *disability*. The ALJ correctly noted that whether a claimant is *disabled* is an issue reserved to the Commissioner. *SSR* 96-5p, 1996 WL 374183 at *2 (Jul. 2, 1996) ("[T]reating source opinions on issues that are reserved to the Commissioner are never entitled to controlling weight or special significance. Giving controlling weight to such opinions would, in effect, confer upon the treating source the authority to make the determination or decision about whether an individual is under a disability, and thus would be an abdication of the Commissioner's statutory responsibility to

---

[16] The Court notes an ALJ is prohibited from assigning *controlling weight* to a *non-treating* source. "[Controlling weight] is the term used in 20 CFR 404.1527(d)(2) and 416.927(d)(2) to describe the weight we give to a medical opinion from a **treating source** that must be adopted." *SSR* 96-2p, 1996 WL 374188 at *2 (Jul. 2, 1996) (emphasis added).

determine whether an individual is disabled."). In accordance with *SSR* 96-5p the ALJ did not ignore Dr. Weiss's opinions about Mr. Thomas's *disability*. *Id.*

The ALJ found Dr. Weiss's opinions concerning Mr. Thomas's *disability* were apparently based on Mr. Thomas's subjective complaints, rather than clinical findings. R. at 17. The ALJ further noted inconsistencies in Dr. Weiss's opinion. For instance on March 18, 2005, about 3 weeks after Mr. Thomas's accident, Dr. Weiss remarked that Mr. Thomas "certainly cannot work at the heavy type of work he normally does." R. at 287. On June 22, 2005 Dr. Weiss noted it has been five months since the injury and that Mr. Thomas has unable to return to work. "He could do light duty at this point." R. at 280. On October 12, 2005 Dr. Weiss recorded that he had not seen Mr. Thomas since June 22, 2005 and that Mr. Thomas had returned to work. R. at 279. Based on Mr. Thomas's complaints and the physical examination Dr. Weiss decided to keep Mr. Thomas off from work. *Id.* On October 27, 2005 Dr. Weiss reported that Mr. Thomas continues to be in pain and "is unable to work in his present condition." R. at 278. However less than a month later, on November 23, 2005, Dr. Weiss opined that Mr. Thomas "still is not able to do heavy-type of work. He could do some type of sedentary position[.]" R. at 276.

The Court finds the ALJ accorded appropriate weight to the State agency physicians' opinions as well as to the opinions of Mr. Thomas's treating physicians. The ALJ's determination therefore is supported by substantial evidence.

C.      *Mr. Thomas's Subjective Complaints*

Plaintiff asserts the ALJ failed to give proper credence to Mr. Thomas's subjective complaints of pain. The Court has reviewed the ALJ's decision, arguments of Plaintiff and

arguments of the Commissioner.  Finding the arguments of the Commissioner consistent with the evidence of record, the Court adopts the arguments as outlined on pages 38-40 of the Commissioner's memorandum.  Substantial evidence supports the ALJ's determination.

5. **Conclusion.**

Substantial evidence supports the decision that Mr. Thomas is not disabled. Accordingly, Plaintiff's Motion for Summary Judgment will be denied and Defendant's Motion for Summary Judgment will be granted.

Date: April 21, 2011                    _____/s/_____
                                                    WILLIAM CONNELLY
                                                    UNITED STATES MAGISTRATE JUDGE